The Law Office of John F. Olsen, LLC
John F. Olsen
105 Grove Street, Suite 6
Montclair, New Jersey 07042
t. (973) 932-0474
f. (973) 453-8264

*Attorneys for Plaintiff Jorge Lopez-Henriquez*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| JORGE LOPEZ-HENRIQUEZ,<br><br>      Plaintiff,<br><br>    -v-<br><br>DIAMOND FOUNDRY, INC.,<br><br>      Defendants. | Civil Action No. 2:22-cv-4267<br><br>**COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

   Plaintiff Jorge Lopez-Henriquez for his complaint against Diamond Foundry, Inc., alleges as follows.

   1. Plaintiff Jorge Lopez-Henriquez is a resident of New Jersey.

   2. Defendant Diamond Foundry, Inc. is a Delaware corporation with its principal place of business in San Francisco, California.

   3. This Court has jurisdiction over the subject matter of this action under 28 U.S.C. sections 1332 and 2201, as there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

   4. Venue is proper in this district under 28 U.S.C. section 1391(b) as defendant directs business and sells products into this district through retail establishments, the internet and through other means.

5. Defendant Diamond Foundry is a company that manufactures, markets and sells lab grown diamonds.

6. Plaintiff worked for Diamond Foundry as its Vice President, Software from February 22, 2016 to March 25, 2016.

7. During his time at defendant Diamond Foundry, plaintiff entered into a written Restricted Stock Purchase Agreement with Diamond Foundry. A copy of the Stock Purchase Agreement is attached hereto as Exhibit A. Under this agreement, plaintiff was awarded 150,000 shares of Diamond Foundry stock that vested on the following schedule: 1/48th upon execution and then 1/48th per every month of employment.

8. Under the Stock Purchase Agreement, plaintiff owns 6250 shares of Diamond Foundry stock.

9. Defendant Diamond Foundry's Chief Executive Officer and Founder, R. Martin Roscheisen, confirmed that plaintiff owned 6250 shares of Diamond Foundry stock in a March 29, 2016 email to plaintiff: "I'm hereby confirming again that you own 6,250 shares of DF Restricted Common Stock."

10. Under Article 4 of the Stock Purchase Agreement, the defendant was to hold the stock until plaintiff requested delivery of the stock: the stock "shall be delivered to the Purchaser at Purchaser's request." Article 2 of the Stock Purchase Agreement states that the Closing of the stock transfer transaction shall occur at a time mutually convenient for the parties.

11. In June 2021, plaintiff made his first request for the delivery of his stock shares and the company, citing a loan agreement and claiming it was defaulted, denied that request.

12. In May 2022, through his lawyer, plaintiff again requested delivery of the stock shares with the same result – the company again responded by claiming that plaintiff defaulted on a loan agreement.

13. Plaintiff never entered into a loan agreement with the company and the Stock Purchase Agreement does not reference a loan. Rather, as explained above, under the Stock Purchase Agreement, payment for the employee's shares was to be made at the closing, which was to be scheduled after the employee requested his shares.

### FIRST CLAIM FOR RELIEF –- DECLARATORY JUDGMENT

14. Plaintiff Lopez-Henriquez repeats and realleges each and every allegation contained in paragraphs 1 through 13 of this complaint as if fully set forth herein.

15. Under the Stock Purchase Agreement, plaintiff was to receive 6250 shares of Diamond Foundry stock upon request.

16. Plaintiff twice requested the delivery of his shares, and the defendant denied his request each time.

17. Plaintiff fully performed his obligations under the parties' agreement.

18. As a result of defendant Diamond Foundry's refusal to deliver plaintiff his shares in the company, there is an actual, justiciable controversy between defendant Diamond Foundry and plaintiff.

19. A declaration is necessary and appropriate at this time so that the parties may know their rights and obligations under their agreement.

### SECOND CLAIM FOR RELIEF –- BREACH OF CONTRACT

20. Plaintiff Lopez-Henriquez repeats and realleges each and every allegation contained in paragraphs 1 through 19 of this complaint as if fully set forth herein.

21.     Under the Stock Purchase Agreement, plaintiff was to receive 6250 shares of Diamond Foundry stock upon request.

22.     Plaintiff twice requested the delivery of his shares and the defendant denied his request each time.

23.     Plaintiff fully performed his obligations under the parties' agreement.

24.     Defendant Diamond Foundry has breached the parties' agreement by not delivering to plaintiff the shares he owns in Diamond Foundry.

25.     Defendant Diamond Foundry's breach of the agreement has damaged plaintiff in an amount to be proved at trial.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff respectfully requests that this Court:

a. Enter judgment in his favor on all claims against the defendant;

b. Enter a declaratory judgment (i) finding that plaintiff is entitled to 6250 shares in Diamond Foundry, and (ii) ordering Diamond Foundry to schedule and attend the closing and deliver 6250 shares to plaintiff Lopez-Henriquez;

c. Award plaintiff compensatory damages so as to make him whole for all compensation and benefits he would have received had he been granted shares in a timely manner, including, but not limited to, the value of his equity, lost profits, the cost of any increased tax liabilities and interest;

d.  Award plaintiff interest and costs; and

e. Granting such other and further relief as this Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury as to all issues so triable.

| | |
|---|---|
| Dated: Montclair, New Jersey<br>June 24, 2022 | **THE LAW OFFICE OF JOHN F. OLSEN, LLC**<br><br>　/s/ *John F. Olsen*　<br>John F. Olsen<br>Attorneys for Plaintiff<br><br>105 Grove Street, Suite 6<br>Montclair, New Jersey 07042<br>t. (973) 932-0474 |

**CERTIFICATION PURSUANT TO LOCAL RULE 11.2**

It is hereby certified that the matter in controversy is not the subject of any other pending action in any court, nor is it the subject of any pending arbitration or administrative proceeding.

Date: June 24, 2022      　/s/ *John F. Olsen*　
　　　　　　　　　　　　John F. Olsen, Esq. (JO 8553)

5

# EXHIBIT A

# DIAMOND FOUNDRY INC.

## RESTRICTED STOCK PURCHASE AGREEMENT

This Restricted Stock Purchase Agreement (the "*Agreement*") is made as of <u>Feburary 21st, 2016</u> by and between Diamond Foundry Inc., a Delaware corporation (the "*Company*"), and Jorge Lopez (the "*Purchaser*", "*Service Provider*").

In consideration of the mutual covenants and representations set forth below, the Company and the Purchaser agree as follows:

1. **Purchase and Sale of the Shares.** Subject to the terms and conditions of this Agreement, the Company agrees to sell to the Purchaser, the Purchaser agrees to purchase, 150,000 shares of the Company's Common Stock, par value $0.00001 per share (the "*Shares*"), at a price per share of $.196195 for a total purchase price of $29,429.25.

2. **Closing.** The purchase and sale of the Shares shall occur at a closing (the "*Closing*") to be held on the date first set forth above, or at any other time mutually agreed upon by the Company and the Purchaser. The Closing will take place remotely via exchange of documents and signatures or at such other place as shall be designated by the Company. At the Closing, the Purchaser shall deliver the aggregate Purchase Price set forth above to the Company by wire transfer, check or any other method of payment permissible under applicable law and approved by the Company's Board of Directors (or any combination of such methods of payment), and the Company will issue, as promptly thereafter as practicable, a stock certificate, registered in the name of the Purchaser, reflecting the Shares.

3. **Repurchase Option.** In the event the Service Provider ceases to be an employee, consultant, advisor, officer or director of the Company for any or no reason, including, without limitation, by reason of the Purchaser's death or disability (as defined in Section 22(e)(3) of the Internal Revenue Code of 1986, as amended (the "*Code*"), "*Disability*"), resignation or involuntary termination, the Company shall, from such time (as determined by the Company in its discretion), have an irrevocable, exclusive option to repurchase (the "*Repurchase Option*") any Shares which have not yet been released from the Repurchase Option (the "*Unreleased Shares*"), at a price per share equal to the lesser of (x) the fair market value of the Shares at the time the Repurchase Option is exercised, as determined by the Company's board of directors and (y) the Purchase Price (the "*Repurchase Price*"). The Repurchase Option is exercised or deemed exercised, within ninety (90) days of the date the Purchaser ceases to be a Service Provider.

4. **Release of Shares from Repurchase Option; Vesting.**

(a) **Vesting.** The "Vesting Commencement Date" shall be February 24th, 2016. ~~On the first anniversary of the Vesting Commencement Date, so long as the Service Provider's continuous status as employee or consultant has not yet terminated, one fourth (1/4th) of the Shares shall be released from the Repurchase Option.~~ So long as the Service Provider's continuous status as employee or consultant has not yet terminated, an additional one forty-eighth (1/48) of the Shares shall be released from the Repurchase Option on the corresponding day of each month thereafter (or if there is no corresponding day in any such month, on the last

day of such month), until all Shares have been released on the fourth anniversary of the Vesting Commencement Date.

(b) **Delivery of Released Shares.** The Shares which have been released from the Company's Repurchase Option shall be delivered to the Purchaser at the Purchaser's request.

5. **Purchaser Investment Representations**. The Purchaser hereby makes the following investment representations to the Company, and acknowledges that the Company will rely on such representations in issuing the Shares.

(a) **Company Reliance on Representations**. The Purchaser understands that the Company's sale of the Shares to him has not been registered under the Securities Act of 1933, as amended (the "*Securities Act*"), because the Company believes, relying in part on the Purchaser's representations in this document, that an exemption from such registration requirement is available for such sale. The Purchaser understands that the availability of this exemption depends upon the representations the Purchaser is making to the Company in this document being true and correct.

(b) **Purchase for Investment**. The Purchaser is purchasing the Shares solely for investment purposes, and not for further distribution. The Purchaser's entire legal and beneficial ownership interest in the Shares is being purchased and shall be held solely for the Purchaser's account, except to the extent the Purchaser intends to hold the Shares jointly with the Purchaser spouse. The Purchaser is not a party to, and does not presently intend to enter into, any contract or other arrangement with any other person or entity involving the resale, transfer, grant of participation with respect to or other distribution of any of the Shares. The Purchaser's investment intent is not limited to the Purchaser's present intention to hold the Shares for the minimum capital gains period specified under any applicable tax law, for a deferred sale, for a specified increase or decrease in the market price of the Shares, or for any other fixed period in the future.

(c) **Protection of Purchaser's Own Interests**. The Purchaser can properly evaluate the merits and risks of an investment in the Shares and can protect his own interests in this regard, whether by reason of the Purchaser's own business and financial expertise, the business and financial expertise of certain professional advisors unaffiliated with the Company with whom the Purchaser has consulted, or the Purchaser's preexisting business or personal relationship with the Company or any of its officers, directors or controlling persons.

(d) **Information about the Company**. The Purchaser is sufficiently aware of the Company's business affairs and financial condition to reach an informed and knowledgeable decision to acquire the Shares. The Purchaser has had opportunity to discuss the plans, operations and financial condition of the Company with its officers, directors or controlling persons, and has received all information he deems appropriate for assessing the risk of an investment in the Shares.

(e) **Economic Risk**. The Purchaser realizes that the purchase of the Shares involves a high degree of risk, and that the Company's future prospects are uncertain. The

-2-

SF1 1599587v.2

Purchaser is able to hold the Shares indefinitely if required, and able to bear the loss of my entire investment in the Shares.

(f) **Restricted Securities**. The Purchaser understands that the Shares are "restricted securities" in that the Company's sale of the Shares to him has not been registered under the Securities Act in reliance upon an exemption for non-public offerings. In this regard, the Purchaser also understands and agrees that:

(i) the Purchaser must hold the Shares indefinitely, unless any subsequent proposed resale by the Purchaser is registered under the Securities Act, or unless an exemption from registration is otherwise available (such as Rule 144);

(ii) the Company is under no obligation to register any subsequent proposed resale of the Shares by the Purchaser; and

(iii) the certificate evidencing the Shares will be imprinted with a legend which prohibits the transfer of the Shares unless such transfer is registered or such registration is not required in the opinion of counsel for the Company.

(g) **Rule 144**. The Purchaser is familiar with Rule 144 adopted under the Securities Act, which in some circumstances permits limited public resales of "restricted securities" like the Shares acquired from an issuer in a non-public offering. The Purchaser understands that Purchaser's ability to sell the Shares under Rule 144 in the future is uncertain, and may depend upon, among other things: (i) the availability of certain current public information about the Company; (ii) the resale occurring more than a specified period after Purchaser's purchase and full payment (within the meaning of Rule 144) for the Shares; and (iii) if the Purchaser is an affiliate of the Company (A) the sale being made in an unsolicited "broker's transaction," transactions directly with a market maker or riskless principal transactions, as those terms are defined under the Securities Exchange Act of 1934, as amended, (B) the amount of Shares being sold during any three- (3-) month period not exceeding the specified limitations stated in Rule 144, and (C) timely filing of a notice of proposed sale on Form 144, if applicable.

(h) **Public Market for the Shares**. The Purchaser understands that the requirements of Rule 144 may never be met, and that the Shares may never be saleable under the rule. The Purchaser further understands that at the time Purchaser's wishes to sell the Shares, there may be no public market for the Company's stock upon which to make such a sale, or the current public information requirements of Rule 144 may not be satisfied, either of which may preclude Purchaser from selling the Shares under Rule 144 even if the relevant holding period had been satisfied.

(i) **Further Restrictions on Resale**. The Purchaser understands that in the event Rule 144 is not available to Purchaser, any future proposed sale of any of the Shares by him will not be possible without prior registration under the Securities Act, compliance with some other registration exemption (which may or may not be available), or each of the following: (i) the Purchaser's written notice to the Company containing detailed information regarding the proposed sale, (ii) the Purchaser providing an opinion of Purchaser's counsel to the

-3-

effect that such sale will not require registration, and (iii) the Company notifying the Purchaser in writing that its counsel concurs in such opinion.  The Purchaser understands that neither the Company nor its counsel is obligated to provide me with any such opinion.  The Purchaser understands that although Rule 144 is not exclusive, the Staff of the SEC has stated that persons proposing to sell private placement securities other than in a registered offering or pursuant to Rule 144 will have a substantial burden of proof in establishing that an exemption from registration is available for such offers or sales, and that such persons and their respective brokers who participate in such transactions do so at their own risk.

(j) **Share Valuation**.  The Purchaser understands that the Board of Directors believes its valuation of the Shares represents a fair appraisal of their worth, but that it remains possible that, with the benefit of hindsight, the Internal Revenue Service may successfully assert that the value of the Shares on the date of the Purchaser's purchase is substantially greater than the Board's appraisal.  The Purchaser understands that any additional value ascribed to the Shares by such an IRS determination will constitute ordinary income to Purchaser as of the purchase date, and that any additional taxes and interest due as a result will be Purchaser's sole responsibility payable only by Purchaser, and that the Company need not and will not reimburse the Purchaser for that tax liability.

(k) **Residence**.  The address of the Purchaser's principal residence is set forth on the signature page below.

6. **Restrictions on Transfer**.

(a) **Legends.**  The Purchaser understands and agrees that the Company shall cause the legends set forth below, or substantially equivalent legends, to be placed upon any certificate(s) evidencing ownership of the Shares, together with any other legends that may be required by the Company or by applicable state or federal securities laws:

> THE SECURITIES REPRESENTED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 (THE "ACT") AND MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED, PLEDGED OR HYPOTHECATED UNLESS AND UNTIL REGISTERED UNDER THE ACT OR, IN THE OPINION OF COUNSEL SATISFACTORY TO THE ISSUER OF THESE SECURITIES, SUCH OFFER, SALE OR TRANSFER, PLEDGE OR HYPOTHECATION OTHERWISE COMPLIES WITH THE ACT.

> THE SHARES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO CERTAIN RESTRICTIONS ON TRANSFER, A RIGHT OF FIRST REFUSAL, A LOCK-UP PERIOD IN THE EVENT OF A PUBLIC OFFERING AND A REPURCHASE OPTION HELD BY THE ISSUER OR ITS ASSIGNEE(S) AS SET FORTH IN THE RESTRICTED STOCK PURCHASE AGREEMENT BETWEEN THE ISSUER AND THE ORIGINAL HOLDER OF THESE SHARES, A COPY OF WHICH MAY BE OBTAINED AT THE PRINCIPAL OFFICE OF THE ISSUER. SUCH TRANSFER RESTRICTIONS, RIGHT OF

FIRST REFUSAL, LOCK-UP PERIOD AND REPURCHASE OPTION ARE BINDING ON TRANSFEREES OF THESE SHARES.

(b) **Stop-Transfer Notices.** The Purchaser agrees that to ensure compliance with the restrictions referred to herein, the Company may issue appropriate "stop transfer" instructions to its transfer agent, if any, and that, if the Company transfers its own securities, it may make appropriate notations to the same effect in its own records.

(c) **Refusal to Transfer.** The Company shall not be required (i) to transfer on its books any Shares that have been sold or otherwise transferred in violation of any of the provisions of this Agreement or (ii) to treat as owner of such Shares or to accord the right to vote or pay dividends to any purchaser or other transferee to whom such Shares shall have been so transferred.

(d) **Lock-Up Period.** The Purchaser hereby agrees that the Purchaser shall not sell, offer, pledge, contract to sell, grant any option or contract to purchase, purchase any option or contract to sell, grant any right or warrant to purchase, lend or otherwise transfer or encumber, directly or indirectly, any Shares or other securities of the Company, nor shall the Purchaser enter into any swap, hedging or other arrangement that transfers to another, in whole or in part, any of the economic consequences of ownership of any Shares or other securities of the Company, during the period from the filing of the first registration statement of the Company filed under the Securities Act, that includes securities to be sold on behalf of the Company to the public in an underwritten public offering under the Securities Act through the end of the one hundred eighty- (180-) day period following the effective date of such registration statement (or such other period as may be requested by the Company or the underwriters to accommodate regulatory restrictions on (i) the publication or other distribution of research reports and (ii) analyst recommendations and opinions, including, but not limited to, the restrictions contained in NASD Rule 2511(f)(4) or NYSE Rule 472(f)(4), or any successor provisions or amendments thereto). The obligations described in this section shall not apply to a registration relating solely to employee benefit plans on Form S-l or Form S-8 or similar forms that may be promulgated in the future, or a registration relating solely to a transaction on Form S-4 or similar forms that may be promulgated in the future. The Purchaser further agrees, if so requested by the Company or any representative of its underwriters, to enter into such underwriter's standard form of "lockup" or "market standoff" agreement in a form satisfactory to the Company and such underwriter. In the event that the Purchaser refuses to execute any such agreement, the Purchaser hereby agrees to comply with all of the transfer restrictions set forth above in this section for an additional thirty (30) days beyond each one hundred eighty- (180-) day (or other) period otherwise called for above. The Purchaser agrees that the Company may assign any or all of its rights under this section to the managing underwriter for any registered offering described in this section, and that such managing underwriter shall be able to further assign such rights in its sole discretion, in each case without any notice to or consent from the Purchaser being required. The Purchaser further agrees that any assignee of the Company's rights under this section shall not be subject to any obligation of the Company set forth in this Agreement. The Company may impose stop-transfer instructions with respect to securities subject to the foregoing restrictions until the end of any such restriction period.

(e) **Unreleased Shares.** No Unreleased Shares subject to the Repurchase Option contained in Section 3 of this Agreement, nor any beneficial interest in such Shares, shall be sold, transferred, encumbered or otherwise disposed of in any way (whether by operation of law or otherwise) by the Purchaser, other than as expressly permitted or required by Section 3.

(f) **Released Shares.** No Shares purchased pursuant to this Agreement, nor any beneficial interest in such Shares, shall be sold, transferred, encumbered or otherwise disposed of in any way (whether by operation of law or otherwise) by the Purchaser or any subsequent transferee, other than in compliance with the Company's right of first refusal provisions contained in Section 7 of this Agreement.

7. **Company's Right of First Refusal.** Before any Shares acquired by the Purchaser pursuant to this Agreement (or any beneficial interest in such Shares) may be sold, transferred, encumbered or otherwise disposed of in any way (whether by operation of law or otherwise) by the Purchaser or any subsequent transferee (each a "Holder"), such Holder must first offer such Shares or beneficial interest to the Company and/or its assignee(s) as follows:

(a) **Notice of Proposed Transfer.** The Holder shall deliver to the Company a written notice stating: (i) the Holder's bona fide intention to sell or otherwise transfer the Shares; (ii) the name of each proposed transferee; (iii) the number of Shares to be transferred to each proposed transferee; (iv) the bona fide cash price or other consideration for which the Holder proposes to transfer the Shares; and (v) that by delivering the notice, the Holder offers all such Shares to the Company and/or its assignee(s) pursuant to this section and on the same terms described in the notice.

(b) **Exercise of Right of First Refusal.** At any time within thirty (30) days after receipt of the Holder's notice, the Company and/or its assignee(s) may, by giving written notice to the Holder, elect to purchase all, but not less than all, of the Shares proposed to be transferred to any one or more of the proposed transferees, at the purchase price determined in accordance with Section 7(c).

(c) **Purchase Price.** The purchase price for the Shares purchased by the Company and/or its assignee(s) under this section shall be the price listed in the Holder's notice.

(d) **Payment.** Payment of the purchase price shall be made, at the option of the Company and/or its assignee(s), in cash (by check), by cancellation of all or a portion of any outstanding indebtedness of the Holder to the Company and/or its assignee(s), or by any combination thereof within thirty (30) days after receipt by the Company of the Holder's notice (or at such later date as is called for by such notice).

(e) **Holder's Right to Transfer.** If all of the Shares proposed in the notice to be transferred to a given proposed transferee are not purchased by the Company and/or its assignee(s) as provided in this section, then the Holder may sell or otherwise transfer such Shares to that proposed transferee; *provided* that: (i) the transfer is made only on the terms provided for in the notice, with the exception of the purchase price, which may be either the price listed in the notice or any higher price; (ii) such transfer is consummated within fifteen (15) days after the date the notice is delivered to the Company; (iii) the transfer is effected in accordance with any

-6-

applicable securities laws, and if requested by the Company, the Holder shall have delivered an opinion of counsel acceptable to the Company to that effect; and (iv) the proposed transferee agrees in writing to receive and hold the Shares so transferred subject to all of the provisions of this Agreement, including but not limited to this section, and there shall be no further transfer of such Shares except in accordance with the terms of this section. If any Shares described in a notice are not transferred to the proposed transferee within the period provided above, then before any such Shares may be transferred, a new notice shall be given to the Company, and the Company and/or its assignees shall again be offered the right of first refusal described in this section.

(f) **Exception for Certain Family Transfers.** Notwithstanding anything to the contrary contained elsewhere in this section, the transfer of any or all of the Shares during the Holder's lifetime or on the Holder's death by will or intestacy to the Holder's spouse, child, father, mother, brother, sister, father-in-law, mother-in-law, brother-in-law, sister-in-law, grandfather, grandmother, grandchild, cousin, aunt, uncle, niece, nephew, stepchild, or to a trust or other similar estate planning vehicle for the benefit of the Holder or any such person, shall be exempt from the provisions of this section; *provided* that, in each such case, the transferee agrees in writing to receive and hold the Shares so transferred subject to all of the provisions of this Agreement, including but not limited to this section, and there shall be no further transfer of such Shares except in accordance with the terms of this section; and *provided further*, that without the prior written consent of the Company, which may be withheld in the sole discretion of the Company, no more than three transfers may be made pursuant to this section, including all transfers by the Holder and all transfers by any transferee.

(g) **Termination of Right of First Refusal.** The right of first refusal contained in this section shall terminate as to all Shares purchased hereunder upon the earlier of: (i) the closing date of the first sale of Common Stock of the Company to the general public pursuant to a registration statement filed with and declared effective by the Securities and Exchange Commission under the Securities Act, and (ii) the closing date of a Change of Control pursuant to which the holders of the outstanding voting securities of the Company receive securities of a class registered pursuant to Section 12 of the Securities Exchange Act of 1934, as amended.

8. **Voting.** You hereby irrevocably grant to, and appoint, a person designated by the Company's Chairman as Stockholder proxy and attorney-in-fact (with full power of substitution), for and in the name, place and stead of Shares, to vote any or all of the Shares or grant a consent or approval in respect of the Shares, at any meeting of the shareholders of the Corporation, or at any adjournment thereof or in any other circumstances upon which a vote, agreement, consent (including unanimous written consents) or other approval is sought, as set forth in Section 2 hereof. Such attorney-in-fact may evidence the taking of any action, giving of any consent or the voting of such Shares by the execution of any document or instrument for such purpose in the name of such Shareholder.

9. **General Provisions.**

(h) **Choice of Law.** This Agreement shall be governed by the internal substantive laws, but not the choice of law rules, of California.

    (i)  **Integration.**  This Agreement, including all exhibits hereto, represents the entire agreement between the parties with respect to the purchase of the Shares by the Purchaser and supersedes and replaces any and all prior written or oral agreements regarding the subject matter of this Agreement including, but not limited to, any representations made during any interviews, relocation discussions or negotiations whether written or oral.

    (j)  **Notices.**  Any notice, demand, offer, request or other communication required or permitted to be given by either the Company or the Purchaser pursuant to the terms of this Agreement shall be in writing and shall be deemed effectively given the earlier of (i) when received, (ii) when delivered personally, (iii) one business day after being delivered by facsimile (with receipt of appropriate confirmation), (iv) one (1) business day after being deposited with an overnight courier service or (v) four (4) days after being deposited in the U.S. mail, First Class with postage prepaid and return receipt requested, and addressed to the parties at the addresses provided to the Company (which the Company agrees to disclose to the other parties upon request) or such other address as a party may request by notifying the other in writing.

    (k)  **Successors.**  Any successor to the Company (whether direct or indirect and whether by purchase, merger, consolidation, liquidation or otherwise) to all or substantially all of the Company's business and/or assets shall assume the obligations under this Agreement and agree expressly to perform the obligations under this Agreement in the same manner and to the same extent as the Company would be required to perform such obligations in the absence of a succession. For all purposes under this Agreement, the term "Company" shall include any successor to the Company's business and/or assets which executes and delivers the assumption agreement described in this section or which becomes bound by the terms of this Agreement by operation of law. Subject to the restrictions on transfer set forth in this Agreement, this Agreement shall be binding upon the Purchaser and his or her heirs, executors, administrators, successors and assigns.

    (l)  **Assignment; Transfers.**  Except as set forth in this Agreement, this Agreement, and any and all rights, duties and obligations hereunder, shall not be assigned, transferred, delegated or sublicensed by the Purchaser without the prior written consent of the Company. Any attempt by the Purchaser without such consent to assign, transfer, delegate or sublicense any rights, duties or obligations that arise under this Agreement shall be void. Except as set forth in this Agreement, any transfers in violation of any restriction upon transfer contained in any section of this Agreement shall be void, unless such restriction is waived in accordance with the terms of this Agreement.

    (m)  **Waiver.**  Either party's failure to enforce any provision of this Agreement shall not in any way be construed as a waiver of any such provision, nor prevent that party from thereafter enforcing any other provision of this Agreement. The rights granted both parties hereunder are cumulative and shall not constitute a waiver of either party's right to assert any other legal remedy available to it.

    (n)  **Further Documents.**  The Purchaser agrees upon request to execute any further documents or instruments necessary or reasonably desirable in the view of the Company

to carry out the purposes or intent of this Agreement, including (but not limited to) the applicable exhibits and attachments to this Agreement.

(o) **Severability.** Should any provision of this Agreement be found to be illegal or unenforceable, the other provisions shall nevertheless remain effective and shall remain enforceable to the greatest extent permitted by law.

(p) **Rights as Stockholder.** Subject to the terms and conditions of this Agreement, the Purchaser shall have all of the rights of a stockholder of the Company with respect to the Shares from and after the date that the Purchaser delivers a fully executed copy of this Agreement (including the applicable exhibits and attachments to this Agreement) and full payment for the Shares to the Company, and until such time as the Purchaser disposes of the Shares in accordance with this Agreement. Upon such transfer, the Purchaser shall have no further rights as a holder of the Shares so purchased except (in the case of a transfer to the Company) the right to receive payment for the Shares so purchased in accordance with the provisions of this Agreement, and the Purchaser shall forthwith cause the certificate(s) evidencing the Shares so purchased to be surrendered to the Company for transfer or cancellation.

(q) **Adjustment for Stock Split.** All references to the number of Shares and the purchase price of the Shares in this Agreement shall be adjusted to reflect any stock split, stock dividend or other change in the Shares which may be made after the date of this Agreement.

(r) **Counterparts.** This Agreement may be executed in one or more counterparts, each of which will be deemed an original, but all of which together will constitute one and the same agreement. Facsimile copies of signed signature pages shall be binding originals.

(*Signature page follows*)

     The parties represent that they have read this Agreement in its entirety, have had an opportunity to obtain the advice of counsel prior to executing this Agreement and fully understand this Agreement. The Purchaser agrees to notify the Company of any change in his or her address below.

PURCHASER, SERVICE PROVIDER

*Name:*   Jorge Lopez-Henriquez
*Address:* 114 Troutman Street #112, Brooklyn, NY, 11206

COMPANY

_____
*Signature*

    Martin Roscheisen
*Name*

    CEO
*Title*

Address: 965 Terminal Way, San Carlos, CA 94070

-10-

**IF YOU WISH TO MAKE A SECTION 83(B) ELECTION, THE FILING OF SUCH ELECTION IS <u>YOUR</u> RESPONSIBILITY.**

**THE FORM FOR MAKING THIS SECTION 83(B) ELECTION IS ATTACHED TO THIS AGREEMENT AS <u>EXHIBIT C</u>.**

**<u>YOU</u> MUST FILE THIS FORM WITHIN THIRTY (30) DAYS OF PURCHASING THE SHARES.**

**<u>YOU</u> (AND <u>NOT</u> THE COMPANY OR ANY OF ITS AGENTS) SHALL BE SOLELY RESPONSIBLE FOR FILING SUCH FORM WITH THE IRS, EVEN IF YOU REQUEST THE COMPANY OR ITS AGENTS TO MAKE THIS FILING ON YOUR BEHALF AND EVEN IF THE COMPANY OR ITS AGENTS HAVE PREVIOUSLY MADE THIS FILING ON YOUR BEHALF.**

*The election should be filed by mailing a signed election form by certified mail, return receipt requested to the IRS Service Center where you file your tax returns. See [www.irs.gov](www.irs.gov)*

SF1 1599587v.2

# EXHIBIT C

## ELECTION UNDER SECTION 83(b) OF THE
## INTERNAL REVENUE CODE OF 1986, AS AMENDED

The undersigned taxpayer hereby elects, pursuant to Section 83(b) of the Internal Revenue Code of 1986, as amended, to include in his or her gross income for the current taxable year, the amount of any compensation taxable to him or her in connection with his or her receipt of the property described below:

1. The name, address, taxpayer identification number and taxable year of the undersigned are as follows:

NAME OF TAXPAYER: _____   SPOUSE: _____

TAXPAYER'S ADDRESS: _____

TAXPAYER ID _____   SPOUSE'S ID #: _____

2. The property with respect to which the election is made is described as follows: _____ shares (the "**Shares**") of the Common Stock of Diamond Foundry Inc. (the "**Company**").

3. The date on which the property was transferred is:

4. The property is subject to the following restrictions:  The Shares may be repurchased by the Company, or its assignee, upon the occurrence of certain events.  This right lapses with regard to a portion of the Shares over time.

5. The fair market value at the time of transfer, determined without regard to any restriction other than a restriction which by its terms will never lapse, of such property is: $\_\_\_\_\_ per share.

6. The amount, if any, paid for such property:

The undersigned has submitted a copy of this statement to the person for whom the services were performed in connection with the undersigned's receipt of the above-described property. The transferee of such property is the person performing the services in connection with the transfer of said property.

The undersigned understand(s) that the foregoing election may not be revoked except with the consent of the Commissioner.

Dated:_____       _____

                                                            Taxpayer

SF1 1599587v.2

-2-

# EXHIBIT D

# SPOUSAL CONSENT

      I, _____, spouse of _____, have read and approve of the foregoing Restricted Stock Purchase Agreement, dated as of _____ ____, 2016, together with all exhibits and attachments thereto (collectively, the "***Agreement***"), by and between my spouse and Diamond Foundry Inc., a Delaware corporation (the "***Company***").  In consideration of the Company's granting of the right to _____ to purchase _____ shares of Common Stock of the Company as set forth in the Agreement, I hereby appoint _____ as my attorney-in-fact in respect to the exercise or waiver of any rights under the Agreement, and agree to be bound by the provisions of the Agreement insofar as I may have any rights in said Agreement or any shares issued pursuant thereto under the community property laws of the State of California, or under similar laws relating to marital property in effect in the state of our residence as of the date of the signing of the foregoing Agreement.

      Dated: _____ _____,2016

                                                                    *[print name of spouse]*

                                         By:_____

                                                   *[signature of spouse]*

SF1 1599587v.2