The Law Office of John F. Olsen, LLC
John F. Olsen
105 Grove Street, Suite 6
Montclair, New Jersey 07042
t. (973) 932-0474
f. (973) 453-8264

*Attorneys for Plaintiff Jorge Lopez-Henriquez*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| JORGE LOPEZ-HENRIQUEZ,<br><br>Plaintiff,<br><br>-v-<br><br>DIAMOND FOUNDRY, INC.,<br><br>Defendants. | Civil Action No. 2:22-cv-4267<br><br>**DECLARATION OF JORGE LOPEZ-HENRIQUEZ IN OPPOSITION TO PLAINTIFF'S MOTION TO DISMISS** |

I, Jorge Lopez-Henriquez, declare as follows:

1.      I am the plaintiff in this case and I make this declaration in opposition to defendant Diamond Foundry's motion to dismiss.

2.      I was an employee of Diamond Foundry for a little more than a month in early 2016.  At the time, Diamond Foundry was in start-up mode and I was offered stock as an incentive to join the company.

3.      Although my employment at Diamond Foundry did not last long, I have followed news reports about the company since my departure.

4.      I base my contention that the stock I earned during my time at Diamond Foundry is worth more than $75,000 on the following items.

5.      Attached hereto as Exhibit A, is a true and correct copy of an article from the Financial Times concerning Diamond Foundry.

6.      Attached hereto as Exhibit B, is a true and correct copy of an article from the <u>Inc.</u> <u>Magazine</u> concerning Diamond Foundry.

7.      Attached hereto as Exhibit C, is a true and correct copy of an SEC filing by Diamond Foundry.

8.      Attached hereto as Exhibit D, is a report from the investment website Roobee.io concerning the sale of rights to purchase Diamond Foundry stock once an IPO is completed.

I declare under penalty of perjury under the laws of the United States that the foregoing statements made by me are true and correct.

Date:  August 22, 2022                    _____

                                         Jorge Lopez-Henriquez

EXHIBIT A

Diamond Foundry valued at $1.8bn after $200m fundraising | Financial Times

**Diamonds and gemstones**

## Diamond Foundry valued at $1.8bn after $200m fundraising

Fidelity's investment to help lab-grown gem start-up boost output to challenge miners



Diamond Foundry rings. The company is also developing diamond wafers for use in the semiconductor industry © Woman wearing Diamond Foundry rings

**Henry Sanderson** APRIL 27 2021

Diamond Foundry has notched up a $1.8bn valuation after a $200m investment by Fidelity that the lab-grown diamond start-up will use to boost its output to compete with gemstone miners such as De Beers.

The Silicon Valley company, which counts Hollywood star Leonardo DiCaprio among its backers, is challenging the traditional diamond industry by producing chemically identical stones.

The funding will help Diamond Foundry in its aim to quintuple production at its Washington state factory to as much as 5m carats a year by the end of 2022 — equivalent to almost a quarter of De Beer's 2020 production.

Case 2:22-cv-04267-WJM-JSA   Document 15-1   Filed 08/23/22   Page 5 of 23 PageID: 106

"This is the first time that this quality of diamond is produced at mining scale," Martin Roscheisen, chief executive, told the Financial Times. He said the company was also looking at opening a second factory, possibly overseas.

The company, which is targeting the high-end jewellery market, sells its diamonds direct to consumers via its Vrai brand as well as through retail partners. It is also developing diamond wafers for use in the semiconductor industry.

Diamond Foundry has doubled production in each of the past four years. Global production of mined diamonds, however, has been falling since its peak of 152m carats in 2017, according to Bain. Last year it slid 20 per cent to 111m carats amid disruption caused by the pandemic.



Martin Roscheisen, chief executive of Diamond Foundry, said: 'All the largest technology companies in the world are looking at doing diamond wafers' © Diamond Foundry

With no new diamond mines coming into production the market is "now at that inflection point", Roscheisen said.

Diamond Foundry says it is selling lab-grown diamonds at higher prices than some natural stones, at an average of $282 per rough carat. It says it made a profit last year.

Diamond Foundry valued at $1.8bn after $200m fundraising | Financial Times

8/23/22, 4:21 PM

Lab-grown diamonds generally sell at a significant discount to natural stones, according to Paul Zimnisky, a diamond analyst who tracks the market. A half-carat lab-grown stone currently sells for about $615, compared with $1,395 for a mined diamond, according to his data.

## Twice weekly newsletter



Energy is the world's indispensable business and Energy Source is its newsletter. Every Tuesday and Thursday, direct to your inbox, Energy Source brings you essential news, forward-thinking analysis and insider intelligence. Sign up here.

The company also plans to spend some of the $200m on perfecting the production of 200mm single-crystal diamond wafers for use in semiconductors.

The use of diamonds instead of silicon in semiconductors can help increase their performance because they are good conductors of heat. Data centres will probably be the first companies to use diamond-wafer chips, but in future they could be used in electric vehicles as well as 5G technology, Roscheisen said.

"All the largest technology companies in the world are looking at doing diamond wafers," he said. "It's quite difficult to have full diamond for chips . . . we haven't completely solved it yet."

Diamond Foundry has raised a total of $315m since its launch in 2012 and has no debt. Other investors include Tony Fadell, former chief executive of smart home pioneer Nest, and Mark Pincus, the founder of video game group Zynga. DiCaprio is an investor and adviser to the company.

Copyright The Financial Times Limited 2022. All rights reserved.

EXHIBIT B



NEWSLETTERS    SUBSCRIBE

INNOVATE

# This Startup Has Raised $100 Million to Sell You Lab-Grown Diamonds
Diamonds don't grow on trees. At the Diamond Foundry, they are grown in a lab. 🔗

BY LIZ WELCH, CO-AUTHOR, 'THE KIDS ARE ALL RIGHT' @LIZMWELCH



Jeremy Scholz, CTO, and R. Martin Roscheisen, CEO, the co-founders of Diamond Foundry. Ian Allen

Unbeknown to most, scientists working in computer labs have been growing diamond shards for decades. But in 2013, solar entrepreneur R. Martin Roscheisen decided to apply the technology to a product far more glamorous–fine jewels. Diamond Foundry, a San Francisco-based company with $100 million in venture capital, has taken aim at the $13 billion

*diamond industry. With 100 employees split between its diamond lab in Silicon Valley and its design studio in downtown Los Angeles, the startup manufactured 10,000 carats' worth of diamonds last year, while doubling its revenue every quarter. Roscheisen explains how his company is cleaning up a dirty industry--while designing some very chic jewelry.*

## Recast your expertise

In 2010, I left Nanosolar, the solar company I'd started in 2002. Our technology was superb, but the Chinese beat us on pricing. We had amassed an incredible group of engineers, including Jeremy Scholz, who co-founded Diamond Foundry with me and is our CTO. We were looking for our next project. I have a PhD in engineering from Stanford, but my real passion is entrepreneurship. I'd been following the diamond-growing science for more than a decade. In 2012, I began to study the technological advancements being made for creating gemstone-size, jewelry-grade white diamonds. Those recent breakthroughs meant a diamond could be grown in a matter of weeks instead of years.

Diamonds made better business sense than solar panels, which cost as much to produce but are less profitable. We knew our engineers could build the plasma reactor necessary to implement the science to grow jewelry-grade diamonds. And we decided to focus on both diamonds and jewelry, because we wanted to create an integrated company whose product goes directly to the consumer. So we hired a leading diamond scientist, who had a 30-year career with a government lab, and paired him with our engineering team.

## Perfect the product

We thought the technology would be the easy part, but it took three dozen engineers, three years, and tens of thousands of plasma-reactor design simulations to get it right. We invested tens of millions of dollars before we produced one diamond.



The Silicon Valley startup bars photographs of its proprietary plasma reactor – "our industry weapon" – but standard diamond tools, like this micrometer gauge, are on display in the company's lab.  Ian Allen

Case 2:22-cv-04267-WJM-JSA   Document 15-1   Filed 08/28/22   Page 11 of 23 PageID: 112

It was worth it. Our plasma reactor is our secret weapon. It produces a diamond like mined diamonds, made of the same crystal. Our technology is based on a variant of chemical vapor deposition, which builds the diamond lattice atom by atom in a reactor that creates a plasma akin to the outer core of the sun.

The reactor, composed of 350 parts, is based on tens of thousands of simulations. Each simulation took nearly a week to perform. The reactor is very complex, and being off by even the tiniest amount can lead to a meltdown.

## Clean up a category

The diamond industry is dominated by very profitable houses like Cartier, the jeweler to the kings for centuries. We wanted to build a new Cartier for people who care about transparency.

More than half of the diamonds on the market today come from conflict regions, like the Congo and Sierra Leone. That reality hasn't changed that much since the movie *Blood Diamond* came out, in 2006. The film revealed a violent industry that uses both slave and child labor to mine and polish the diamonds. It also portrayed the devastating environmental impact that diamond mining has. As a result, people started thinking about the provenance of their diamonds and wanted to be assured that no one, or the earth, was getting hurt in the process of mining them.

Conflict-free diamonds are highly sought after, but it's difficult to prove where any mined diamonds come from, because they can go through two dozen owners between the mine and the consumer. So a diamond is mined somewhere in Africa and traded several times before it makes it to one of the exchanges. From there, it might get traded a few more times before it makes it to India for polishing. The polished stone gets sent

back to the wholesale diamond exchanges, and by then that diamond is virtually untraceable.

Meanwhile, we can make a diamond in two to three weeks in our lab. We're creating a new market of buyers who would not buy a diamond unless it was genuinely ethical. Millennials are our main buyers. We're selling a product based on values, which is what they're attracted to.

## Find your essential partner

Once we perfected the technology, we needed to start designing and selling jewelry, so we began collaborating with designers and sold those items on our website. But we quickly saw the advantage of an in-house jewelry-design team. We met Vanessa Stofenmacher in late 2016, and quickly acquired Vrai & Oro, her L.A.-based company. It was a fast-growing company with great traction on social media. She joined us and brought her team of 20.



This Diamond Foundry collaboration with Barneys and designer Nak Armstrong retails for nearly $5,000. Courtesy Diamond Foundry

We charge roughly the same for our diamonds as what mined diamonds cost. Diamond prices go up and down, and cost more or less depends on size, cut, and clarity. A 2.15-carat rose-cut diamond on our website costs $15,000, whereas a 1.2-carat round cut costs $3,300. We sell each batch as quickly as we make it.

Our goal is to grow bigger diamonds and offer them at slightly below-market prices. Our diamonds grow about a millimeter a month. Making a bigger diamond is hard–it might crack as it grows, and you need more material to start it and a larger reactor. Now we can grow a 15-carat diamond, compared with the three-carat we launched with.

## Counter critics with customer experience

When consumers are skeptical, we tackle it through education. If you ask people abstractly whether they would buy a synthetic diamond, they tend to be disinclined. But that's like asking consumers in 1990 whether they would buy an electric car, at a time when the only electric cars in existence were golf carts. When people see our diamonds in a store and understand their cultivation, there is zero resistance. We lose virtually no customers once people are educated. Cultivated diamonds are simply a better product all around. It's like organic food–it's better.

## A synthetic history

Diamond Foundry's high-tech process is poised to bring lab-grown diamonds to the masses–but it's hardly the first upstart to bet on manufacturing fine jewels.

**1945: Lab-grown gemstones are born.** Caltech grad Carroll F. Chatham's San Francisco-based Chatham Created Gems & Diamonds pioneered commercial-scale lab-grown

gemstones–rubies, emeralds, and sapphires. Today, Chatham's son runs the company, which began manufacturing colored diamonds in the 1980s.

**1990: Diamonds built for computing.** Robert Linares, a Bell Labs PhD with expertise in crystal-growth technology, founded Boston-based Apollo Diamond, which grew diamonds–long coveted for their thermal conductivity–for industries like nanotechnology and computing.

**1996: White diamonds get a manmade makeover.** Retired Army brigadier general Carter Clarke founded Sarasota, Florida-based Gemesis using Russian technology to mass produce gem-grade diamonds. It took the company 15 years to manufacture its first white diamond–a process much more complex than producing the yellow diamonds it had previously been making.

**2005: Synthetics start to shine on e-commerce.** Entrepreneurs Beth Gerstein and Eric Grossberg opened San Francisco, California-based Brilliant Earth, an online retailer founded to sell "ethical" jewelry that today uses lab-grown diamonds and ethically sourced diamonds and gemstones. They claim to be the category's largest direct-to-consumer seller.

**2015: DIY diamond ring.** Two years after purchasing a lab-grown diamond engagement ring, husband-and- wife team Jason Payne and Lindsay Reinsmith opened Silicon Valley-based retailer Ada Diamonds, where customers can design their own synthetic diamond jewelry–up to 10 carats.

EXHIBIT C

The Securities and Exchange Commission has not necessarily reviewed the information in this filing and has not determined if it is accurate and complete.
The reader should not assume that the information is accurate and complete.

## UNITED STATES SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549
## FORM D

### Notice of Exempt Offering of Securities

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235-0076 |
| Estimated average burden hours per response: | 4.00 |

---

### 1. Issuer's Identity

**CIK (Filer ID Number)**

0001853958

**Name of Issuer**

Diamond Foundry Inc.

**Jurisdiction of Incorporation/Organization**

DELAWARE

**Year of Incorporation/Organization**

[X] Over Five Years Ago

[ ] Within Last Five Years (Specify Year)

[ ] Yet to Be Formed

**Previous Names** [ ] None

Paragon Mining Inc.

**Entity Type**

[X] Corporation

[ ] Limited Partnership

[ ] Limited Liability Company

[ ] General Partnership

[ ] Business Trust

[ ] Other (Specify)

---

### 2. Principal Place of Business and Contact Information

**Name of Issuer**

Diamond Foundry Inc.

| Street Address 1 | | Street Address 2 | |
|---|---|---|---|
| 322 EAST GRAND AVENUE | | | |
| City | State/Province/Country | ZIP/PostalCode | Phone Number of Issuer |
| SAN FRANCISCO | CALIFORNIA | 94080 | (415) 636-5222 |

---

### 3. Related Persons

| Last Name | First Name | Middle Name |
|---|---|---|
| Roscheisen | R. | Martin |

| Street Address 1 | Street Address 2 |
|---|---|
| 322 EAST GRAND AVENUE | |

| City | State/Province/Country | ZIP/PostalCode |
|---|---|---|
| San Francisco | CALIFORNIA | 94080 |

**Relationship:** [X] Executive Officer [X] Director [X] Promoter

**Clarification of Response (if Necessary):**

---

| Last Name | First Name | Middle Name |
|---|---|---|
| Buss | Brad | |

| Street Address 1 | Street Address 2 |
|---|---|
| 322 EAST GRAND AVENUE | |

| City | State/Province/Country | ZIP/PostalCode |
|---|---|---|
| San Francisco | CALIFORNIA | 94080 |

Relationship: ☐ Executive Officer ☒ Director ☐ Promoter

Clarification of Response (if Necessary):

---

## 4. Industry Group

☐ Agriculture

Banking & Financial Services

☐ Commercial Banking

☐ Insurance

☐ Investing

☐ Investment Banking

☐ Pooled Investment Fund

Is the issuer registered as
an investment company under
the Investment Company
Act of 1940?

☐ Yes ☐ No

☐ Other Banking & Financial Services

☐ Business Services

Energy

☐ Coal Mining

☐ Electric Utilities

☐ Energy Conservation

☐ Environmental Services

☐ Oil & Gas

☐ Other Energy

Health Care

☐ Biotechnology

☐ Health Insurance

☐ Hospitals & Physicians

☐ Pharmaceuticals

☐ Other Health Care

☐ Manufacturing

Real Estate

☐ Commercial

☐ Construction

☐ REITS & Finance

☐ Residential

☐ Other Real Estate

☐ Retailing

☐ Restaurants

Technology

☐ Computers

☐ Telecommunications

☒ Other Technology

Travel

☐ Airlines & Airports

☐ Lodging & Conventions

☐ Tourism & Travel Services

☐ Other Travel

☐ Other

---

## 5. Issuer Size

| Revenue Range | OR | Aggregate Net Asset Value Range |
|---|---|---|
| ☐ No Revenues | | ☐ No Aggregate Net Asset Value |
| ☐ $1 - $1,000,000 | | ☐ $1 - $5,000,000 |
| ☐ $1,000,001 - $5,000,000 | | ☐ $5,000,001 - $25,000,000 |
| ☐ $5,000,001 - $25,000,000 | | ☐ $25,000,001 - $50,000,000 |
| ☐ $25,000,001 - $100,000,000 | | ☐ $50,000,001 - $100,000,000 |
| ☐ Over $100,000,000 | | ☐ Over $100,000,000 |
| ☒ Decline to Disclose | | ☐ Decline to Disclose |
| ☐ Not Applicable | | ☐ Not Applicable |

**6. Federal Exemption(s) and Exclusion(s) Claimed (select all that apply)**

☐ Investment Company Act Section 3(c)

☐ Rule 504(b)(1) (not (i), (ii) or (iii))  ☐ Section 3(c)(1)  ☐ Section 3(c)(9)
☐ Rule 504 (b)(1)(i)  ☐ Section 3(c)(2)  ☐ Section 3(c)(10)
☐ Rule 504 (b)(1)(ii)  ☐ Section 3(c)(3)  ☐ Section 3(c)(11)
☐ Rule 504 (b)(1)(iii)  ☐ Section 3(c)(4)  ☐ Section 3(c)(12)
☒ Rule 506(b)  ☐ Section 3(c)(5)  ☐ Section 3(c)(13)
☐ Rule 506(c)  ☐ Section 3(c)(6)  ☐ Section 3(c)(14)
☐ Securities Act Section 4(a)(5)  ☐ Section 3(c)(7)

---

**7. Type of Filing**

☒ New Notice   Date of First Sale 2021-03-15  ☐ First Sale Yet to Occur
☐ Amendment

---

**8. Duration of Offering**

Does the Issuer intend this offering to last more than one year?  ☐ Yes ☒ No

---

**9. Type(s) of Securities Offered (select all that apply)**

☒ Equity  ☐ Pooled Investment Fund Interests
☐ Debt  ☐ Tenant-in-Common Securities
☐ Option, Warrant or Other Right to Acquire Another Security  ☐ Mineral Property Securities
☐ Security to be Acquired Upon Exercise of Option, Warrant or Other Right to Acquire Security  ☐ Other (describe)

---

**10. Business Combination Transaction**

Is this offering being made in connection with a business combination transaction, such as a merger, acquisition or exchange offer?  ☐ Yes ☒ No

Clarification of Response (if Necessary):

---

**11. Minimum Investment**

Minimum investment accepted from any outside investor $0 USD

---

**12. Sales Compensation**

Recipient  Recipient CRD Number ☒ None
(Associated) Broker or Dealer ☒ None  (Associated) Broker or Dealer CRD Number  ☒ None
Street Address 1  Street Address 2
City  State/Province/Country  ZIP/Postal Code
State(s) of Solicitation (select all that apply)  ☐ All States  ☐ Foreign/non-US

Check "All States" or check individual States ☐

---

### 13. Offering and Sales Amounts

Total Offering Amount       $199,999,992 USD  or ☐ Indefinite

Total Amount Sold           $199,999,992 USD

Total Remaining to be Sold          $0 USD  or ☐ Indefinite

Clarification of Response (if Necessary):

---

### 14. Investors

☐ Select if securities in the offering have been or may be sold to persons who do not qualify as accredited investors, and enter the number of such non-accredited investors who already have invested in the offering.  [＿＿＿＿＿]

Regardless of whether securities in the offering have been or may be sold to persons who do not qualify as accredited investors, enter the total number of investors who already have invested in the offering:  [20]

---

### 15. Sales Commissions & Finder's Fees Expenses

Provide separately the amounts of sales commissions and finders fees expenses, if any. If the amount of an expenditure is not known, provide an estimate and check the box next to the amount.

Sales Commissions $0 USD  ☐ Estimate

Finders' Fees $0 USD  ☐ Estimate

Clarification of Response (if Necessary):

---

### 16. Use of Proceeds

Provide the amount of the gross proceeds of the offering that has been or is proposed to be used for payments to any of the persons required to be named as executive officers, directors or promoters in response to Item 3 above. If the amount is unknown, provide an estimate and check the box next to the amount.

$0 USD  ☐ Estimate

Clarification of Response (if Necessary):

---

### Signature and Submission

**Please verify the information you have entered and review the Terms of Submission below before signing and clicking SUBMIT below to file this notice.**

**Terms of Submission**

In submitting this notice, each issuer named above is:

- Notifying the SEC and/or each State in which this notice is filed of the offering of securities described and undertaking to furnish them, upon written request, in the accordance with applicable law, the information furnished to offerees.*

- Irrevocably appointing each of the Secretary of the SEC and, the Securities Administrator or other legally designated officer of the State in which the issuer maintains its principal place of business and any State in which this notice is filed, as its agents for service of process, and agreeing that these persons may accept service on its behalf, of any notice, process or pleading, and further agreeing that such service may be made by registered or certified mail, in any Federal or state action, administrative proceeding, or arbitration brought against the issuer in any place subject to the jurisdiction of the United States, if the action, proceeding or arbitration (a) arises out of any activity in connection with the offering of securities that is the subject of this notice, and (b) is founded, directly or indirectly, upon the provisions of: (i) the Securities Act of 1933, the Securities Exchange Act of 1934, the Trust Indenture Act of 1939, the

Investment Company Act of 1940, or the Investment Advisers Act of 1940, or any rule or regulation under any of these statutes, or (ii) the laws of the State in which the issuer maintains its principal place of business or any State in which this notice is filed.

- Certifying that, if the issuer is claiming a Regulation D exemption for the offering, the issuer is not disqualified from relying on Rule 504 or Rule 506 for one of the reasons stated in Rule 504(b)(3) or Rule 506(d).

Each Issuer identified above has read this notice, knows the contents to be true, and has duly caused this notice to be signed on its behalf by the undersigned duly authorized person.

For signature, type in the signer's name or other letters or characters adopted or authorized as the signer's signature.

| Issuer | Signature | Name of Signer | Title | Date |
|--------|-----------|----------------|-------|------|
| Diamond Foundry Inc. | /s/ R. Martin Roscheisen | R. Martin Roscheisen | CEO | 2021-03-29 |

*Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB number.*

* This undertaking does not affect any limits Section 102(a) of the National Securities Markets Improvement Act of 1996 ("NSMIA") [Pub. L. No. 104-290, 110 Stat. 3416 (Oct. 11, 1996)] imposes on the ability of States to require information. As a result, if the securities that are the subject of this Form D are "covered securities" for purposes of NSMIA, whether in all instances or due to the nature of the offering that is the subject of this Form D, States cannot routinely require offering materials under this undertaking or otherwise and can require offering materials only to the extent NSMIA permits them to do so under NSMIA's preservation of their anti-fraud authority.

EXHIBIT D



Type:
**IPO** ETF Portfolio Stock
Historical income
**Description**
Disclaimer

**Pre-IPO successfully completed!**

All users who have participated in this pre-IPO via the Roobee platform have been credited USDT to their account balance.

We want to thank all of you for your participation. We will continue to do our best to select and add only high-quality products for you to get returns on.

**Diamond Foundry** is the largest producer of diamonds for the synthetic diamonds and semiconductor industries in USA.

The Company cultures diamonds with a zero carbon footprint and offers diamond jewelry from independent designers. The founding team of M.I.T., Stanford, and Princeton engineers previously developed pioneering breakthroughs in solar power technology and had a hunch that techniques used to harness the energy of the sun could also be used to make a better diamond, atom by atom.

**How it works?**

UDFO is provided by Unicorn Tokenization Corp which is a fund that buys economic rights for shares of Diamond Foundry on the secondary market from current shareholders. The token represents a share in this fund. The fund is set up in such a way that token holders will get financial returns, equivalent to what owners of the shares get, minus certain applicable fees and expenses. Thanks to the efficiency of the blockchain, UDFO token holders can enjoy instant liquidity. Every time Diamond Foundry's valuation increases, the price of the token will go up, proportionally to the value of the underlying shares. Once Diamond Foundry goes public, the fund will sell underlying shares and distribute proceeds among token holder cryptocurrency wallets proportionally to tokens they are owning.

1 UDFO = 1 of a Diamond Foundry share.

We use Public Ethereum Blockchain as a ledger for UDFO shares: the contract is signed digitally, and contractual rights are also transferred digitally, via electronic transactions in the blockchain database.

**What can you do with the token**

When buying pre-IPO tokens, people purchase a share of a company that has not become public yet, i.e. has not held an IPO. Thus, there is no organized secondary market for the shares of such companies and hence there is no trading as such. Such tokens can be sold in only two cases. First — when the company holds an IPO. In this case, the shares will be sold automatically, and Unicorn Tokenization Corp. will automatically deposit stablecoins to the holders' wallets. Second — when the secondary market comes up where users will have a possibility to buy and sell such pre-IPO tokens. For now, there is no secondary market for this token on the Roobee platform, neither there is a possibility to sell this token.